## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **K.N.L., an individual,** | **Case No.** _____ |
| **Plaintiff,** | **JUDGE** _____ |
| **v.** | **DEMAND FOR JURY TRIAL** |
| **G6 HOSPITALITY,LLC; G6 HOSPITALITY FRANCHISING, LLC; and CHOKKARAS INC.** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff K.N.L. ("Plaintiff" or "K.N.L."), respectfully submits this complaint under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595 ("TVPRA") and the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255 ("CAVRA"). A.C., by and through her undersigned counsel, makes the following averments, all upon information and belief.

## INTRODUCTION

1.     Plaintiff K.N.L. was a 17-year-old child when she was held hostage and sold for sex at hotels owned, operated, maintained, and controlled by Defendants G6 Hospitality, LLC ("G6"), G6 Hospitality Franchising ("G6 Franchising"), and Chokkaras Inc. ("Chokkaras").

2.     K.N.L. was clearly a child under the coercive control of her traffickers when she was held prisoner in hotels owned, operated, maintained, and controlled by Defendants and their agents and employees. Defendants monitored and had control over each of these hotels. Yet, Defendant and their agents and employees continued to rent rooms to K.N.L.'s traffickers, choosing to turn a blind eye to her suffering so that they could continue benefitting financially

from K.N.L.'s trafficking.

3.      From approximately 2015 through 2017, from age 17 through 19, K.N.L. was forced to have sex against her will in Defendants' hotel rooms where she endured violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation. K.N.L.'s traffickers forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse. K.N.L. was raped multiple times per day by multiple men in Defendants' hotel rooms.

4.      Defendants monitored the hotels and controlled the day to day activities at these hotels where there were numerous red flags of trafficking, including but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting certain rooms next to each other and away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large numbers of used condoms in the trash; unusually large amounts of male visitors going in and out of K.N.L.'s room at all hours of the day and night; visible signs of physical abuse; women wearing clothing inappropriate for the weather; and loud noises of abuse and other violence audible to staff and/or other rooms.

5.      These red flags were open and obvious to anyone working at the Defendants' hotel and motel locations and lasted for nearly two (2) years. Thus, there is no doubt that Defendants knew, or at a minimum should have known, that they were profiting from K.N.L.'s trafficking.

6.      At some point, K.N.L. was able to escape the grasps of her traffickers and the prison of the Defendants' hotel and motel rooms. K.N.L. was able to escape her traffickers after confiding in a man at one of the hotels. She had told this man what was happening to her, and he helped to get her out of this heinous situation.

7.      K.N.L. has spent a considerable amount of time attempting to regain the life that

was stripped away from her by her trafficking.

8.      K.N.L. files this lawsuit seeking justice for the harm she suffered as a result of the heinous acts committed against her while she was being sold for sex Defendants'. Defendants and their agents and employees, whom all knew or should have known, that they were benefiting from K.N.L.'s sex trafficking, yet turned a blind eye to her suffering.

## **PARTIES**

9.      Plaintiff K.N.L. is a natural person and a resident and citizen of Middletown, Ohio.

10.      K.N.L. is a victim of human trafficking pursuant to 22 U.S.C. § 7102(17) and (18) U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 11 U.S.C. § 7102(16).

     a.  Due to the sensitive and intimate nature of the issues, K.N.L. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after. [1]

     b.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and personal nature. [3] For good cause, the Court

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal

may issue an order to protect a part or person from annoyance, embarrassment, oppression or undue burden or expense.[4]

c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. K.N.L. fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d. K.N.L. should not be compelled to disclose her identity in order to maintain her privacy and safety. K.N.L.'s privacy interest substantially outweighs the customary practice of judicial openness.[5]

e. Moreover, Defendants will not be prejudiced. K.N.L. will agree to reveal her identity to Defendants for the limited purpose of investigating K.N.L.'s claims once the parties have entered into a protective order. K.N.L. simply seeks redaction of K.N.L.'s personal identifying information from the public docket and assurances that Defendants will not use or publish K.N.L.'s identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

11. **Defendant G6 Hospitality, LLC.** ("G6") is a large hotel brand with over 1,400 branded properties worldwide. It is a Delaware limited liability company with its principal place of business in Carrollton, TX and can be served through its registered agent, Corporation Service Company at 50 W. Broad Street, Suite 1330, Columbus, OH 43215 .G6 owned, supervised, and/or

---

nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

operated the Motel 6 at 10919 J Street, Omaha, NE 68137 ("Omaha Motel 6" and/or "branded property"). The company also provides franchise opportunities for its hotel and motel brands through **Defendant G6 Hospitality Franchising, LLC ("G6 Hospitality")**, a for-profit Delaware company with its principal place of business in Carrolton, Texas. Together G6 and G6 hospitality will collectively be referred to as "G6 Defendants."

    a. G6's Omaha Motel 6 is a G6 brand property.

    b. G6 employees worked throughout Omaha Motel 6. G6 employees worked jobs including front desk and housekeeping. G6 is the principal with control over nearly every element of operations at Omaha Motel 6. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including Omaha Motel 6 where K.N.L. was trafficked.

    c. G6 controlled and dictated the actions and inactions of Omaha Motel 6 through highly specific and detailed brand standards, policies, and procedures.

    d. G6 knowingly benefited, or received something of value, from its ventures at Omaha Motel 6 through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where K.N.L. was trafficked, as well as in maintaining a positive public image for Omaha Motel 6. G6 also benefited from gathering personal data from the Wi-Fi it provided to customers including K.N.L. and her traffickers.

    e. G6 is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio,

contracting to supply services in Ohio. G6 has derived substantial revenue from services rendered in Ohio.

12.     Whenever reference is made in this Complaint to any act, deed, or conduct of G6, the allegation is that G6 engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Omaha Motel 6.

13.     **Defendant Chokkaras Inc.** is an incorporation organized under the laws of and operating within the State of Nebraska. It can be served by its registered agent, Geeta Chokkara, located at 19020 Nicholas Circle, Elkhorn, NE 68022.

14.     K.N.L.'s claims arise out of G6's actual and apparent agency relationship with their branded hotels, including the Omaha Motel 6, where K.N.L. was trafficked. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at their branded hotels.

15.     Plaintiff's claims against Chokkaras Inc. arise out of Chokkaras Inc.'s contacts through Chokkaras Inc.'s relationship with G6. Chokkaras Inc.'s participation in a joint venture with G6 operating Omaha Motel 6 occurred, in substantial part, in Ohio because:

   a. The franchising agreement required Chokkaras Inc. to report information to G6, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve Omaha Motel 6, including those involving sex trafficking victims like K.N.L.

   b. G6 dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects.

   c. Chokkaras Inc. had an ongoing obligation to participate in centralized programs operated by G6.

   d. Reservation information for rooms at Omaha Motel 6 passed through a system operated and managed by G6.

   e. Chokkaras Inc. agreed to make all payments due under the franchising agreement at G6.

   f. Chokkaras Inc.'s operation of Omaha Motel 6 was controlled and/or influenced by many policies set and enforced by G6.

   g. Chokkaras Inc. signed a software licensing agreement with G6 for the property management software, which Chokkaras Inc. used when operating Omaha Motel 6, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. =

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

17. The Court has personal jurisdiction pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

## OVERVIEW OF TRAFFICKING

18. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

19. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that

most individuals involved in prostitution are subject to force, fraud, or coercion.[6] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

20. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[7]

21. Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their individually owned properties. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants chose to ignore the open and obvious presence of sex trafficking on their individually owned properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

22. The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[8] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual

---

[6] See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women intimate-relationship.
[7] Id.
[8] Profits and Poverty: The Economics of Forced Labor, INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

exploitation of victims.

23.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking of K.N.L. at Defendants' Motel.

24.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[9] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[10] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[11] Hotels have been found to account for over 90 percent of commercial exploitation of children.[12]

25.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including the defendants, on best practices for identifying and responding to sex trafficking.[13]

26.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and

---

[9] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-traffickingusslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[10] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[11] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wpcontent/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[12] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[13] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, Red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and End Child Prostitution, Child Pornography, and the Trafficking of Children for Sexual Purposes ("ECPAT"), among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[14]

27.　　　Widely recognized signs of sex trafficking, which can be observed by hotel staff all which Defendants' properties were made of aware of, include but are not limited to:

  a.　Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

  b.　Individuals show signs of physical abuse, restraint, and/or confinement;

  c.　Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

  d.　Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

  e.　Individuals lack freedom of movement or are constantly monitored;

  f.　Individuals avoid eye contact and interaction with others;

  g.　Individuals have no control or possession of money or ID;

  h.　Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

  i.　Individuals have few or no personal items – such as no luggage or other bags;

  j.　Individuals appear to be with significantly older "boyfriend" or in the company

---

[14] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

of older males;

    k.   A group of girls appear to be traveling with an older female or male;

    l.   A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

    m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

    n.   Possession of bulk sexual paraphernalia such as condoms or lubricant;

    o.   Possession or use of multiple cell phones; and

    p.   Possession or usage of large amounts of cash or pre-paid cards.[15]

28.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[16] From check-in to check-out, there are indicators that traffickers and their victims exhibit during their stay at the hotel.

29.    The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit thousands from participating in a venture in violation of § 1591(a).

30.    Defendants' decision to prioritize profits over protecting sex trafficking victims

---

[15] *Id.*
[16] Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

resulted in the repeated sexual exploitation and rape of Plaintiff K.N.L. on their properties.

31.     K.N.L. is a survivor of sex trafficking. Key findings from the Polaris Project are that "[s]urvivors of human trafficking are not thriving. The systems that were supposed to protect them before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems failed."

https://polarisproject.org/national-survivor-study/

32.     K.N.L. looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the TVPRA, 18 U.S.C. § 1595 and 18 U.S.C. § 2255. Defendants knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1595(a).

## FACTUAL BACKRGOUND

### INTRODUCTION

33.     K.N.L. met her traffickers when she was just 17 years old. K.N.L. was basically kidnapped, after someone offered her a ride home. Ultimately her traffickers came to control every aspect of her life. The defining factor of the relationship between K.N.L. and her traffickers, was that each night, K.N.L.'s traffickers forced her to have sex with men for money.

34.     K.N.L. brings her claims against the Defendant for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255 (a).

35.     The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1595 (a) and thereby establishes a non-delegable duty of reasonable care.

36.     CAVRA allows for any minor that suffers personal injury as a result of child sex trafficking to recover damages. 18 U.S.C. § 2255(a).

37.     An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[17] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

38.     As part of their conspiracy, to save costs and continually reap profits. Upon information and belief, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded and independently owned properties—despite the general knowledge in the industry and their own records that human sex trafficking was happening in the hotel industry and in their wholly and independently owned properties. Furthermore, Defendants did not train staff on how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

39.     Upon information and belief, Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences decreased as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

40.     Upon information and belief, Defendants did nothing in the face of the human sex

---

[17] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

trafficking epidemic in their industry. Instead, they continued to profit from the rental of rooms that they knew or should have known were rented and used for the purpose of sex trafficking.

41. Defendants thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its wholly and independently owned properties. Defendants failed to implement appropriate policies and procedures that a reasonably diligent business would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their wholly and independently owned properties.

42. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like K.N.L. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

43. Plaintiff K.N.L.'s injuries are indivisible and cannot be separated. K.N.L.'s injuries are the result of continued instances of ongoing violent, traumatizing sexual exploitation.

44. K.N.L.'s injuries are almost exclusively mental, emotional, and psychological in nature and derive from the trafficking period. The trafficking period is ongoing and continuous and resulting injuries cannot be divided; thereby subjecting Defendants to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by K.N.L.

45. Plaintiff's injuries, particularly K.N.L.'s ongoing mental, emotional, and psychological injuries, have no reasonable basis on which to determine the relative contribution of a particular defendant's conduct to the single harm.

46. Throughout K.N.L.'s trafficking period, she lost more than 100 pounds due to the forced drug use. Her traffickers would often substitute drugs for food as a method of control.

47. Violators of Section 1595 of the TVPRA are jointly and severally liable for a

victim's damages. Victims are entitled to all compensatory and non-compensatory damages incurred during their trafficking period. 18 U.S.C. § 1595(a). Thus, Defendants are jointly and severally liable for K.N.L.'s damages in this case.

### THE SEX TRAFFICKING OF PLAINTIFF K.N.L. AT OMAHA MOTEL 6

48.    K.N.L. met her traffickers when she was just seventeen (17) years old.

49.    By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, K.N.L. was held captive and sold for sex by her traffickers.

50.    Plaintiff K.N.L. was subjected to sex trafficking at the branded Omaha Motel 6 located at 10919 J Street, Omaha, NE 68137 from Winter 2015 through Spring 2017.

51.    K.N.L. was forced to have sex with the night manager.

52.    During the time that she was trafficked, K.N.L.'s traffickers frequently rented rooms at the Defendants' motel because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with K.N.L.

53.    Throughout her trafficking, K.N.L.'s traffickers connected with "johns" by posting or causing to be posted advertisements on Backpage, advertising for K.N.L.'s availability for commercial sex. K.N.L.'s traffickers posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

54.    K.N.L. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels and motels.

55.    From approximately 2015 through 2017, while under the coercive control of her traffickers, K.N.L. was imprisoned in hotels rooms rented by her traffickers and forced to have sex

for money.

56.     While at Defendants' branded property, K.N.L.'s traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape. Her deterioration and poor health conditions were obvious to anyone who saw her.

57.     During her captivity at Defendants' branded property, K.N.L. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned.

58.     At the above-listed motel, K.N.L. encountered the same staff on multiple occasions. Defendants staff would have seen the signs of K.N.L.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

59.     Every time K.N.L. interacted with the Defendants' staff, it was readily apparent that K.N.L. was under the control of her traffickers.

60.     K.N.L.'s traffickers followed a repetitive and routine procedure during stays at the Defendants' branded property, and Defendants knew or should have known of K.N.L.'s trafficking because of a variety of factors detailed below.

61.     K.N.L. consistently witnessed clear signs of others being sex trafficked at the same times she was trafficked at the Defendants' hotels and motels, meaning it should have been easily detectible upon reasonable inspection.

62.     It became clear to K.N.L. during the time of her trafficking that her trafficker's and the Defendants' sex trafficking operation was a routine business operation and the hotels and motels were welcoming and participating in.

63.     Hotel staff at Omaha Motel 6 frequently placed K.N.L. and her traffickers in a room away from other guests. There were only male guests in and out of K.N.L. and her traffickers' room while multiple girls were kept in a room at once.

64.     On more than one occasion, K.N.L.'s traffickers physically abused her at the Omaha Motel 6.

65.     K.N.L.'s pain and suffering at the Omaha Motel 6 was ongoing, as loud sounds of abuse and K.N.L.'s screams for help could often be heard from the room.

66.     Further, K.N.L.'s stays at the Omaha Motel 6 resulted in several consistent red flags, including, but not limited to: paying for stays in cash; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms;  and loitering or soliciting on hotel grounds.

67.     K.N.L. was repeatedly raped and otherwise sexually abused many times at the Omaha Motel 6.

68.     Due to the relationships between Defendants' employees and K.N.L.'s traffickers, K.N.L. understood that the Defendants' hotels and motels staff, employees, and owners would not help her and that she would likely be beaten or killed if she sought help from them.

69.     Based on information and belief, before and at the time K.N.L. was trafficked at the Omaha Motel 6, G6 staff saw K.N.L. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. G6 and their employees directly witnessed all signs of sex trafficking, including the trafficking of K.N.L., described above.

70.     One of K.N.L.'s traffickers was affiliated with the nephew of the owners of the Omaha Motel 6. K.N.L. confronted the owner's wife at one point, telling her she was a horrible person for allowing this to happen to her and other women.

71.     G6 knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for prolonged stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

72.     G6 has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

73.     Based upon information and belief, G6 read all online reviews about their property. Numerous reviews were left online about the Omaha Motel 6 that directly put G6 on notice of red flags of sex trafficking, including during Winter 2015 through Spring 2017. Reviews specifically mention prostitution on the property, hookers and women of the night, frequent police presence, and loud noises at all hours of the day and night.

74.     Information has become public through news stories establishes the pervasive nature of the Defendants role in providing a venue where sex trafficking has occurred for years. Not only at the location K.N.L. was trafficked, but also at G6 hotel locations across the country.

75.     As such, G6 knew and should have known that K.N.L. was being trafficked at the Omaha Motel 6.

76.     At all times relevant, during Winter 2015 through Spring 2017, G6 profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with K.N.L.'s traffickers for her sex trafficking.

## **DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR BRANDED LOCATIONS**

77.     G6 Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[18] The United Nations,[19] international non-profits,[20] and the U.S. Department of Homeland Security,[21] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

---

[18] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[19] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[20] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[21] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

78.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

79.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[22] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[23] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

80.     G6 Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  The Defendants nevertheless do not share such information with other hotel

---

[22]     *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

[23]     *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

81.     G6 Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

82.     G6 Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

## DEFENDANTS FACILITATED AND HARBORED THE TRAFFICKING OF PLAINTIFF

83.     G6 is a signatory of the Code[24] and thereby has promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

84.     Defendant G6 is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and G6 publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, G6 should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

85.     Defendants profited from the sex trafficking of Plaintiff. Defendants rented rooms to and provided Wi-Fi to Plaintiff's traffickers when they knew, or should have known, that human

---

[24] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

trafficking was prevalent within their branded properties and at the specific locations where Plaintiff was trafficked. The hotel staff, especially front desk staff, at Defendants' properties knew or should have known of the obvious signs of Plaintiff's trafficking.

86.     Defendants benefited from the steady stream of income that Plaintiff's traffickers and "johns" bring to their hotel brand. Defendants profited from each and every room that Plaintiff's traffickers and customers rented where Plaintiff was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time Plaintiff's traffickers and customers used Defendants' Wi-Fi to advertise and solicit Plaintiff for commercial sex.

87.     Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where Plaintiff was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

88.     Moreover, Defendants repeatedly collected data on Plaintiff, her traffickers, and her "johns" from her many stays at Defendants' hotel, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of Plaintiff's trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for months, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants would have taken proper measures, Defendants would not have profited from Plaintiff

and other victims like her being trafficked at their locations.

89.     Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where Plaintiff was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

90.     Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where Plaintiff was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

91.     In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

92.     Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

> a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

93. As a direct and proximate result of these egregious practices on the part of the Defendants, Plaintiff and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## DEFENDANT'S CONTROL OVER THEIR BRAND HOTELS

### G6

94.     G6 exercises day-to-day control over G6's Omaha Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over G6's Omaha Motel 6, as either direct subsidiaries or under the terms of its franchise agreements.

95.     Upon information and belief, G6 controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a.  Requiring the branded locations to use G6's centralized property management, data management, and reservation and billing systems;

b.  Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through G6's centralized systems;

c.  Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

d.  Requiring brands to purchase products through G6's e-procurement marketplace system or from approved suppliers;

e.  Requiring branded properties to pay fees based of the percentage of gross room revenues;

f.  Providing advertising requirements and standardized marketing services for the branded locations;

g.  Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

i. Regulating employment policies at branded location including training and orientation materials for staff;

j. Requiring branded locations to make modifications to the branded properties upon G6's request and to refrain from make substantial changes to the branded property without G6's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[25]

96. G6 jointly employs all staff located G6's Omaha Motel 6 where K.N.L. was trafficked.

97. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by G6.

98. G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.[26]

99. G6 requires branded properties to use a centralized, cloud-based reservation and

---

[25] See e.g. 2017 Motel 6 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/motel-6-2017-fdd-summary/motel-6-2017-fdd/

[26] G6 offers a centralized reservations system on its website, a customer support channel, and press releases and announcements about the Motel 6 brand through g6hospitality.com; G6 also offers a reward program specific to the Motel 6 brand. See Join My6, MOTEL 6, https://www.motel6.com/en/home/my6/join.html

property management system.[27]

100.    G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[28]

101.    G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives G6 the ability to access, monitor, and harvest that internet data.[29]

102.    G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.[30]

## DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE FOR K.N.L.'S DAMAGES

103.    The venture or ventures in which each Defendant participated were direct, producing and proximate causes of the injuries and damages to K.N.L.

104.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to K.N.L. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

## COUNT 1: 18 U.S.C. § 1595 ("TVPRA") (AGAINST ALL DEFENDANTS)

105.    Plaintiff incorporates each foregoing allegation in paragraphs 1 through 104.

106.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

---

[27] *See* Michal Christine Escobar, *2020 Enterprise Innovator: Motel 6,* HOSPITALITY TECHNOLOGY, https://hospitalitytech.com/2020-enterprise-innovator-motel-6
[28] G6 Hospitality. *Privacy Policy,* https://www.motel6.com/en/home/policies/privacy-policy.html
[29] Motel 6, *Web and Mobile Ethical Vulnerability Disclosure Policy,* https://www.motel6.com/en/home/policies/vulnerability-disclosure.html
[30] *Combatting Human Trafficking,* G6 HOSPITALITY, https://g6hospitality.com/about-us/combating-human-trafficking/

107. Furthermore, Defendants acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of K.N.L. and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

108. Defendants have continued to benefit as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or kickbacks from internet usage, contributing to their direct financial benefit from the sex trafficking of K.N.L. when they knew or should have known that violations of §1595(a) were occurring.

109. Despite Defendants' knowledge of K.N.L.'s sex trafficking, K.N.L.'s traffickers was able to continue renting rooms for the sexual exploitation of K.N.L.

110. Defendants participated in a venture together and with, among others, K.N.L.'s traffickers. Defendants had an ongoing business relationship and association in fact with K.N.L.'s traffickers. Despite knowing or having reason to know that K.N.L. was being sex trafficked in violation of the TVPRA, Defendants continued to rent rooms to her traffickers, providing a secure venue for K.N.L.'s sexual exploitation. K.N.L.'s sex traffickers used Defendants' Motel because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits.

Defendants profited while K.N.L.'s traffickers was able to rent a secure venue to earn profits by trafficking K.N.L. Defendants participated in the venture by continually renting rooms to K.N.L.'s traffickers, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of K.N.L.'s trafficking.

111.    Defendants' failure to train and supervise their agents and employees, as well as their disregard for the welfare of their guests, including K.N.L., enabled and contributed to her sex trafficking.

112.    The facts alleged establish that Defendants knowingly benefited, financially or by receiving anything of value, from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

113.    Plaintiff K.N.L. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and motels. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages, therefore Defendants are jointly and severally liable.

## COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA") (AGAINST ALL DEFENDANTS)

114.    Plaintiff incorporates each forgoing allegation.

115.    Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

116.    Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

117.    Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

118.    Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18

U.S.C. § 1591(a)(2).

119.    Defendants knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

120.    Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her traffickers rooms in hotels and Wi-Fi used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

121.    Defendants knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

122.    Defendants engaged in a conspiracy to ignore and actively refrain from engaging in any conduct that would prevent them from profiting from sex trafficking at their branded properties.

123.    Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

   a.    Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost

wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.      Disgorgement of profits obtained through unjust enrichment;

c.      Restitution;

d.      Statutory and/or treble damages, where available;

e.      Punitive damages;

f.      Attorneys' fees and expenses;

g.      The costs of this action;

h.      Pre- and post-judgment interest; and

i.      Any other relief the Court or jury deems appropriate.


**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by a struck jury.

Dated: September 23, 2025

Respectfully submitted,

*<u>/s/ Penny L. Barrick</u>*
Penny L. Barrick (0074110)
Steven C. Babin, Jr. (0093584)
Jeremy W. Hoshor-Johnson (0075502)
Babin Law, LLC
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: Steven.babin@babinlaws.com /
Jeremy.hoshorjohnson@babinlaws.com /
Penny.barrick@babinlaws.com